## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. _____

ASHLEY LEMKE, an individual,

        **Plaintiff**,

        v.

SOAP KORNER, LLC, a Colorado limited liability company,

        **Defendant**.

_____

## COMPLAINT AND JURY DEMAND
_____

COMES NOW the Plaintiff, Ashley Lemke, by and through her undersigned counsel of record, William B. Ross of Montgomery Little & Soran, PC, and William Marler of Marler Clark, LLP, PS, to allege and complain as follows:

## I.  PARTIES

1.1     The Plaintiff Ashley Lemke ("Ms. Lemke") resides in Bismarck, North Dakota, and is therefore a Citizen of the State of North Dakota.

1.2     Soap Korner, LLC ("Defendant") is a corporation organized and existing under the laws of the State of Colorado, with its principal office or place of business located in Colorado Springs, Colorado.  The Defendant is a manufacturer and seller of bath, body and other specialty products, including a variety of teas that contain an herbal compound called kratom. The Defendant manufactured and sold Ms. Lemke a tea product advertised on its website as "Red MD," which contained kratom that was contaminated by *Salmonella* bacteria.

## II.  JURISDICTION AND VENUE

2.1     This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the Defendant is a resident of Colorado.

2.2     Venue in the United States District Court for the District of Colorado is proper pursuant to 28 USC § 1391(a)(2) because a substantial part of the events or omissions giving rise to the plaintiffs' claims and causes of action occurred in this judicial district, and because the defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III.  GENERAL ALLEGATIONS

### The Outbreak

3.1     Since identifying kratom on an import alert for unapproved drugs in 2012 and on a second import alert in February 2014 regarding kratom-containing dietary supplements and bulk dietary ingredients, FDA has taken a number of additional actions, including:

3.2     In September 2014, U.S. Marshals, at the FDA's request, seized more than 25,000 pounds of raw kratom material worth more than $5 million from Rosefield Management, Inc. in Van Nuys, California.

3.3     In January 2016, U.S. Marshals, at the FDA's request, seized nearly 90,000 bottles of dietary supplements labeled as containing kratom and worth more than $400,000. The product, manufactured for and held by Dordoniz Natural Products LLC, located in South Beloit, Illinois, is marketed under the brand name RelaKzpro.

3.4     In August 2016, U.S. Marshals, at the FDA's request, seized more than 100 cases of products labeled as containing kratom and worth more than $150,000. The products are distributed by Nature Therapeutics LLC, which does business as Kratom Therapy and is located in Grover Beach, California. The seized products are marketed under the brand name Kratom Therapy.

3.5     FDA reported forty-four  reported deaths associated with the use of kratom.

3.6     On February 12, 2018, the FDA learned of a multistate outbreak of salmonellosis from a rare strain of *Salmonella* I 4,[5],12:b:-.

3.7     On February 20, 2018, CDC announced that, as of February 16th, twenty-eight (28) people in twenty (20) states were infected, and that eleven (11) people had been hospitalized. Eight of eleven people interviewed reported consuming kratom as pills, powder, or tea.

3.8     On February 28, 2018, CDC reported forty (40) people in twenty-seven (27) states were infected with *Salmonella* I 4,[5],12:b:-. Fourteen of those people had been hospitalized. Seventeen (17) of the twenty-four (24) ill people interviewed reported consuming kratom before getting sick.

3.9     On February 28, 2018, the North Dakota and Utah Departments of Health collected leftover kratom powder from ill people in their states. The outbreak strain of *Salmonella* I 4,[5],12:b:- was identified in both samples. The ill person in North Dakota reported purchasing S.K. Herbalist brand kratom powder from the website "soapkorner.com." The ill person in Utah reported purchasing kratom powder from the website "kratoma.com."

3.10    On March 8, 2018, Oregon Health Agency issued a press release warning that kratom products could be contaminated with the Salmonella bacteria after two people in Oregon, who consumed the herbal supplement, fell ill.

3.11    On March 9, 2018, PDX Aromatics voluntarily recalled Red Dragon Kratom Powder, Red Vein Borneo Kratom Powder, Red Vein Sumatra Kratom Powder, Red Vein Thai Kratom Powder and Super Indo Kratom Powder sold through Kraken Kratom, Phytoextractum, and Soul Speciosa.

3.12    As of March 14, 2018, the FDA and its state partners had tested multiple kratom products and twenty-five (25) of these products were positive for *Salmonella*. Three matched this outbreak strain, while twenty-two (22) tested positive for a different *Salmonella* or tested positive for *Salmonella* and further testing is pending.

3.13    As of March 14, 2018, CDC reports that eighty-seven people in thirty-five states have been reported infected with outbreak strains from four serotypes: *Salmonella* I 4,[5],12:b:-, *Salmonella* Javiana, *Salmonella* Okatie, and *Salmonella* Thompson. Twenty-seven people have been hospitalized.

3.14    On March 16, 2018, PDX Aromatics of Portland, Oregon ("Aromatics"), expanded its recall in response to additional positive product samples of *Salmonella* associated with Aromatics' products.

3.15    On March 21, 2018, the FDA listed four additional products in the table below tested by Oregon Health Authority identified as positive for *Salmonella* collected from the retailer Torched Illusions. The two labeled distributors of these products collected at Torched Illusions are Triangle Pharmanaturals and Pure Distribution LLC, both of Las Vegas, NV.

3.16    On March 22, 2018, Aromatics again expanded its recall in response to additional positive product samples of *Salmonella* associated with Aromatics' products.

3.17    On March 29, 2018, NutriZone, LLC of Houston, Texas issued a recall in response to positive product samples of *Salmonella* associated with NutriZone, LLC's products.

3.18    On April 2, 2018, the FDA issued a mandatory recall order for all food products containing powdered kratom manufactured, processed, packed, or held by Triangle Pharmanaturals, LLC of Las Vegas, Nevada, after several of these products were found to contain *Salmonella*. The agency took this action after the company failed to cooperate with the FDA's request to conduct a voluntary recall. The products that are part of the mandatory recall include, but are not limited to: Raw Form Organics Maeng Da Kratom Emerald Green, Raw Form Organics Maeng Da Kratom Ivory White, and Raw Form Organics Maeng Da Kratom Ruby Red.   The strains of *Salmonella* found in Triangle Pharmanaturals' products are not currently linked to the outbreak.

3.19    As of April 2, 2018, the FDA and its state partners have tested multiple kratom products, and twenty-six different products were positive for *Salmonella*.

3.20    As of April 5, 2018, CDC reports that a total of 132 people infected with outbreak strains of *Salmonella* I 4,[5],12:b:- (61), *Salmonella* Javiana  (15), *Salmonella* Okatie  (21), or *Salmonella* Thompson (35) have been reported from thirty-eight (38) states.

3.21    Products and associated companies that tested positive for *Salmonella* include:

| Product | Retailer | Known or Labeled Distributor |
|---|---|---|
| Pain Out Malay Kratom | | NutriZone, LLC, Houston, |

| Product | Retailer | Known or Labeled Distributor |
|---|---|---|
| | | TX |
| Nirvanio Green Malay | | NutriZone, LLC, Houston, TX |
| Pain Out Maeng Da Kratom | | NutriZone, LLC, Houston, TX |
| Pain Out Thai Kratom | | NutriZone, LLC, Houston, TX |
| Non-branded kratom powder | | Triangle Pharmanaturals, Las Vegas, NV |
| Molecule Precision Labs Kratom Super Green Malay | | Pure Distribution LLC, Las Vegas, NV |
| Molecule White Vein | Torched Illusions, Beaverton, OR | Pure Distribution LLC, Las Vegas, NV |
| Molecule Green Maeng Da | Torched Illusions, Tigard, OR | Pure Distribution LLC, Las Vegas, NV |
| Raw Form Organics Maeng Da Emerald Green | Torched Illusions, Tigard, OR | Triangle Pharmanaturals, Las Vegas, NV |
| Raw Form Organics Maeng Da Ivory White | Torched Illusions, Tigard, OR | Triangle Pharmanaturals, Las Vegas, NV |
| Raw Form Organics Maeng Da Ruby Red | | Triangle Pharmanaturals, Las Vegas, NV |
| Red Maeng Da (RMD 1-kg) | Kratoma (buy-kratom.us) | Kratoma |
| S.K. Herbalist Red Tea MD | Soap Korner (soapkorner.com) | Soap Korner, Colorado Springs, CO |
| Red Vein Borneo | Phytoextractum (phytoextraxtum.com) | PDX Aromatics, Portland, OR |

| Product | Retailer | Known or Labeled Distributor |
|---------|----------|------------------------------|
| Red Borneo | Kraken Kratom (krakenkratom.com) | PDX Aromatics, Portland, OR |
| Red Dragon (Red Vein) | Kraken Kratom (krakenkratom.com) | PDX Aromatics, Portland, OR |
| White Maeng Da | Kraken Kratom (krakenkratom.com) | PDX Aromatics, Portland, OR |
| NXT GEN Botanicals Maeng Da | Smoke Station, Salt Lake City, UT | NGB Corp, West Jordan, UT |
| Eclipse Premium Maeng Da | Smoke Station, Salt Lake City, UT | Tamarack, Cheyenne, WY |
| Dragon Bali | Fastrac, Salt Lake City, UT | Not stated |
| Green Bali bulk powder | Torched Illusions, Tigard, OR | Unlabeled |
| Green Sumatra bulk powder | Torched Illusions, Tigard, OR | Unlabeled |
| Green Malaysian bulk powder | Torched Illusions, Tigard, OR | Unlabeled |
| White Maeng Da bulk powder | Torched Illusions, Tigard, OR | Unlabeled |
| White Borneo bulk powder | Torched Illusions, Tigard, OR | Unlabeled |
| White Sumatra bulk powder | Torched Illusions, Tigard, OR | Unlabeled |

### The *Salmonella* Bacteria

3.22     *Salmonella* is the second most common intestinal infection in the United States. More than 7,000 cases of Salmonella were confirmed in 2009; however, the majority of cases go unreported. According to a 2011 report, the Center for Disease Control and Prevention estimates

that over one million people in the U.S. contract *Salmonella* each year, and that an average of 20,000 hospitalizations and almost 400 deaths occur from *Salmonella* poisoning.

3.23    *Salmonella* infection usually occurs when a person eats food contaminated with the feces of animals or humans carrying the bacteria.  *Salmonella* outbreaks are commonly associated with eggs, meat and poultry, but these bacteria can also contaminate other foods such as fruits and vegetables. Foods that are most likely to contain *Salmonella* include raw or undercooked eggs, raw milk, contaminated water, and raw or undercooked meats.

3.24    Symptoms of *Salmonella* infection, or Salmonellosis, range widely, and are sometimes absent altogether. The most common symptoms include diarrhea, abdominal cramps, and fever.

3.25    Typical Symptoms of *Salmonella* infection, which appear 6 to 72 hours after eating contaminated food and last for 3 to 7 days without treatment, include:

- Diarrhea,
- Abdominal Cramps,
- Fever of 100° F to 102° F,
- Bloody diarrhea,
- Vomiting,
- Headache, and
- Body Aches.

3.26    Complications of *Salmonella* poisoning are more likely to occur among young children and people aged 65 or older. Possible complications, like reactive arthritis, are thought to occur in 2 to 15 percent of *Salmonella* patients. Symptoms include inflammation of the joints, eyes, or reproductive or urinary organs. On average, symptoms appear eighteen (18) days after infection. Irritable Bowel Syndrome can also be a long-term complication.

3.27    *Salmonella* infections generally last 3 to 7 days, and often do not require

treatment. People with severe dehydration may need rehydration through an IV. Antibiotics are recommended for those at risk of invasive disease, including infants under three months old. Typhoid fever, which is an acute illness associated with the fever caused by *Salmonella*, can be treated with a 14-day course of antibiotics. Unfortunately, treatment of *Salmonella* has become more difficult as it has become more resistant to antibiotics. Finding the right antibiotic for a case of *Salmonella* is crucial to treating this bacterial infection.

### The Plaintiff's *Salmonella* illness

3.28    On or about December 15, 2017, Ms. Lemke ordered two kinds of kratom products from the Defendant Soap Korner's website, "Red MD" and "Chocolate," both of which were advertised and sold on the website as "tea."

3.29    This was the second time that Ms. Lemke had ordered kratom from Defendant's website, having earlier purchased multiple samples.  She began consuming kratom due to her own research showing that kratom could help with fibromyalgia.

3.30    The Defendant sent Ms. Lemke the products that she ordered, which arrived at her home in Bismarck, N.D., on or about December 20, 2017.  Ms. Lemke began consuming the chocolate variety, but quickly found that she liked the Red MD better, and so began consuming Red MD exclusively.

3.31    On or about January 3, 2018, Ms. Lemke began to suffer from a low grade fever, chills, and body aches.  She began to suffer from repeated bouts of diarrhea two days later.

3.32    On or about January 8, Ms. Lemke went to a walk-in clinic, where she was diagnosed with a likely viral illness.  She was discharged without any specific treatment. Afterward, her symptoms became more severe.

3.33    By the following evening, on or about January 9, Ms. Lemke felt intensely nauseated and deeply chilled.  Her husband arrived home and found her laying on the couch, clearly suffering.  They took her temperature, and it registered nearly 106° F.  They immediately went to the emergency department at Sanford Hospital in Bismarck.

3.34    Ms. Lemke was treated in the ER and admitted to the regular hospital for further care and treatment.  Over the course of the next several days, she endured a variety of painful and intrusive diagnostic tests, including a spinal tap to check for meningitis.

3.35    On or about January 12, a serum or stool sample submitted by Ms. Lemke tested positive for *Salmonella*.  Now that she knew what was making her so ill, Ms. Lemke requested to be discharged from the hospital.  Her physician allowed discharge, feeling that she was medically stable, though still quite ill.  She was put on the antibiotic ciprofloxacin for approximately 10 days.

3.36    On or about January 16, an official from the North Dakota Department of Health contacted Ms. Lemke to discuss her *Salmonella* illness.  Ms. Lemke provided as much detail as she could recall about her exposures, food and environment.  During the conversation, Ms. Lemke also related that she had been consuming kratom products, as that was a new addition to her diet and she wondered whether it could have been the source of her illness.

3.37    On or about February 12, as the multi-state investigation into the kratom outbreak, described above, was advancing, the North Dakota state public health lab contacted Ms. Lemke and requested to test her leftover kratom products.  She allowed the lab to take the rest of her Red MD kratom, and on or about February 27, she learned that the product had tested positive for *Salmonella*.  In fact, the public health lab informed her that whole genome sequencing had

been done on the isolates from the positive tests on Red MD, and that the results were "highly related" to other human isolates around the country.

3.38    Ms. Lemke continued in her recovery for several weeks before her gastrointestinal tract began to function normally.  Since being discharged from the hospital, she has followed-up with her primary physician who has recommended that Ms. Lemke take probiotics.

## IV.  CAUSES OF ACTION

### Strict Liability—Count I

4.1    By this reference, the Plaintiff incorporates the preceding paragraphs of this Complaint as if each was set forth here in its entirety.

4.2    At all times relevant hereto, the Defendant was a manufacturer and seller of the adulterated food product that is the subject of the action.

4.3    The adulterated food product that the Defendant manufactured, distributed, or sold was, at the time it left the Defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *Salmonella*, a harmful pathogen.

4.4    The adulterated food product that the Defendant manufactured, distributed, or sold reached the Plaintiff without any change in its defective condition.  The adulterated food product that the Defendant manufactured, distributed, or sold was used in the manner expected and intended, and was consumed by Plaintiff.

4.5    Plaintiff suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the Defendant manufactured, distributed, or sold.

## Negligence—Count II

4.6     By this reference, the Plaintiff incorporates the preceding paragraphs of this Complaint as if each was set forth here in its entirety.

4.7     The Defendant owed to the Plaintiff a duty to use reasonable care in the manufacture, distribution, and sale of its food product, the observance of which duty would have prevented or eliminated the risk that the Defendant's food products would become contaminated with *Salmonella* or any other dangerous pathogen.  The Defendant breached this duty because the food that it manufactured, distributed, and sold to the Plaintiff was contaminated by *Salmonella*.

4.8     The Defendant had a duty to properly supervise, train, and monitor its employees, and to ensure its employees' compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products, but the Defendant failed to do so and therefore breached this duty.

4.9     The Defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, and regulations, and that were clean, free from adulteration, and safe for human consumption, but the Defendant failed to do so and therefore breached this duty.

4.10    As a direct and proximate result of the Defendant's acts and omissions of negligence, the Plaintiff sustained injuries and damages in an amount to be proven at trial.

## Negligence Per Se—Count III

4.11    By this reference, the Plaintiff incorporates the preceding paragraphs of this

Complaint as if each was set forth here in its entirety.

4.12    The Defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including the requirements of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301 *et seq*) and the Colorado Pure Food and Drug Act (C.R.S. § 25-5-401 *et seq.*).

4.13    The Plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the manufacture, distribution, storage, and sale of similar food products.

4.14    The Defendant failed to comply with the provisions of the health and safety acts identified above, and, as a result, was negligent *per se* in its manufacture, distribution, and sale of food adulterated with *Salmonella*, a deadly pathogen.

4.15    As a direct and proximate result of conduct by the Defendant that was negligent *per se*, the Plaintiff sustained damages in an amount to be proven at trial.

## **DAMAGES**

5.1    The Plaintiff has suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the Defendant, in an amount that shall be fully proven at the time of trial.  These damages include, but are not limited to: damages for general pain and suffering; damages for loss of enjoyment of life, both past and future; medical and medical related expenses, both past and future; travel and travel-related expenses, past and future; emotional distress, past and future; pharmaceutical expenses, past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

**JURY DEMAND**

The Plaintiff hereby demands a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for judgment against the Defendant as follows:

A.    Ordering compensation for all general, special, incidental, and consequential damages suffered by the Plaintiff as a result of the Defendant's conduct;

B.    Awarding Plaintiff its reasonable attorneys fees and costs, to the fullest extent allowed by law;

C.    Awarding Plaintiff pre and post judgment interest, to the fullest extent allowed by law; and

D.    Granting all such additional and/or further relief as this Court deems just and equitable.

DATED:  April 10, 2018

MONTGOMERY LITTLE & SORAN, PC

*s/ John R. Riley*
William B. Ross, Esq.
John R. Riley, Esq.
5445 DTC Parkway, Suite 800
Greenwood Village, CO 80111
Phone: (303) 773-8100
Email:  wross@montgomerylittle.com

MARLER CLARK, LLP. PS

*s/ William D. Marler*
William D. Marler, Esq.
1012 First Avenue, Fifth Floor
Seattle, WA  98104
Phone (206) 369-3141
Email:  bmarler@marlerclark.com